# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 13, 2017                Decided May 23, 2017

No. 16-5185

RAMON CIERCO, IN HIS PERSONAL CAPACITY AND
DERIVATIVELY ON BEHALF OF HIMSELF AND ALL OTHERS
SIMILARLY SITUATED, ET AL.,
APPELLANTS

v.

STEVEN T. MNUCHIN, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE TREASURY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01641)

*Eric L. Lewis* argued the cause for appellants. With him on the brief was *A. Katherine Toomey.*

*Sarah Carroll*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General at the time the brief was filed, and *H. Thomas Byron, III*, Attorney.

Before: ROGERS and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Senior Circuit Judge*
EDWARDS.

EDWARDS, *Senior Circuit Judge*: In 2015, the Department
of Treasury's Financial Crimes Enforcement Network
("FinCEN") suspected that Banca Privada d'Andorra S.A.
("the Bank") was being used to launder money. Pursuant to
Section 311 of the USA PATRIOT Act, FinCEN issued a
Notice of Finding and a Notice of Proposed Rulemaking (the
"Notices") proposing to cut off the Bank's ties to the United
States' financial system. Without completing the rulemaking
process that these Notices contemplated, FinCEN effectively
achieved its goals when the Andorran Government seized the
assets of the Bank and began a process to sell off those assets.

After the Andorran Government took control of the Bank,
Appellants – the majority shareholders of the Bank – filed suit
in the District Court, claiming that FinCEN violated the
Administrative Procedure Act ("APA") in issuing the Notices.
Appellants' complaint sought two principal remedies: (1) an
order requiring FinCEN to withdraw the Notices, and (2) a
declaration that the Notices were unlawfully issued. While the
case was pending before the District Court, FinCEN, satisfied
that the Bank no longer posed a money laundering concern,
withdrew both Notices. The District Court then granted
FinCEN's motion to dismiss on the grounds that the case was
moot. Appellants filed an appeal from that judgment.
Subsequent to the District Court's decision, the Andorran
Government finalized the sale of the Bank's assets to a private
investment firm.

We agree with the District Court that this case should be
dismissed, but for different reasons. When FinCEN withdrew
the Notices, Appellants received full relief on their first claim.
Therefore, we agree that Appellants' first claim for relief is

moot. Appellants' second claim for relief – a declaration that the Notices were unlawful – is not moot, but they no longer have standing to press this claim.

When Appellants first filed their law suit, they had standing to challenge the legality of the Notices. However, once their claim for the withdrawal of the Notices became moot, Appellants had the burden to show that they still had standing to seek a declaratory order that the Notices were unlawful. They have not met this burden. Even assuming that Appellants have the requisite injury and causation to support standing, they have not shown that a judicial order will effectively redress their alleged injuries. We therefore dismiss the case because Appellants' first claim is moot and they lack standing to pursue their second claim.

## I.    BACKGROUND

### A.  *Statutory Framework*

Section 311 of the USA PATRIOT Act ("the Act") authorizes the Secretary of the Treasury, upon a finding that a foreign financial institution is "of primary money laundering concern," to impose "special measures" upon any domestic financial institution that does business with the foreign institution. 31 U.S.C. § 5318A(b). The Secretary has delegated his authority under Section 311 to FinCEN, a bureau of the Department of Treasury. 31 C.F.R. § 1010.810(a). The Act provides, *inter alia*, that:

> In making a finding that reasonable grounds exist for concluding that a jurisdiction outside of the United States [or] 1 or more financial institutions operating outside of the United States . . . is of primary money laundering concern so as to authorize the Secretary of the Treasury to take 1 or more of the special measures

described in subsection (b), the Secretary shall consult with the Secretary of State and the Attorney General.

31 U.S.C. § 5318A(c)(1). The Act also states that "the Secretary shall consider [additional] information [determined] to be relevant," including a number of "Jurisdictional" and "Institutional" factors listed in the statute. *Id.* § 5318A(c)(2)(A), (B).

If FinCEN determines that a foreign institution is of primary money laundering concern, Section 311 authorizes FinCEN to take one or more of five special measures. Four of these special measures – including recordkeeping and information disclosure requirements – may be imposed by FinCEN "by regulation, order, or otherwise as permitted by law." *Id.* § 5318A(a)(2)(B). The fifth, and most severe, measure that FinCEN may take against a foreign institution is to prohibit the "opening or maintaining in the United States of a correspondent account or payable-through account by any domestic financial institution . . . for or on behalf of [that] foreign banking institution." *Id.* § 5318A(b)(5). "[I]mposing this measure has the effect of eliminating or curtailing a foreign banking institution's access to the U.S. financial system and to transactions involving the U.S. dollar." *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 115 (D.D.C. 2015). As such, the fifth special measure "can be a 'death sentence' for smaller foreign banks who depend on access to U.S. dollar clearing through correspondent accounts." STEVEN MARK LEVY, FEDERAL MONEY LAUNDERING REGULATION: BANKING, CORPORATE AND SECURITIES COMPLIANCE § 30.03(E) (2d ed. Supp. 2017).

Unlike the other four special measures, the fifth measure may only be imposed "by regulation." 31 U.S.C. § 5318A(a)(2)(C). The APA requires FinCEN to publish a "notice of proposed rule making . . . in the Federal Register,"

allowing interested parties an opportunity to comment. 5 U.S.C. § 553(b)–(c). FinCEN must then publish a final rule to give effect to the special measure. *See, e.g.*, 31 C.F.R. § 1010.659 (imposing the fifth special measure against North Korean financial institutions).

In practice, however, FinCEN often achieves the intended effects of the fifth special measure before it completes the rulemaking process. The Government Accountability Office has explained that,

> once a proposed rule is issued, almost all U.S. financial institutions immediately implement it voluntarily, stopping financial transactions with designated financial institutions or jurisdictions. . . . U.S. banks often treat proposed Section 311 rules as final and generally cut off all financial interactions with the targeted institution. . . . U.S. banks may be taking this action because the proposed rule is associated with a finding of primary money laundering concern and, in many instances, Treasury issued a finding together with a notice of proposed rule-making. Because it makes good business sense to protect banks from risks to their reputation and possible government penalties, banks may discontinue business with other banks labeled a primary money laundering concern to reduce their reputational risk.

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-08-1058, USA PATRIOT ACT: BETTER INTERAGENCY COORDINATION AND IMPLEMENTING GUIDANCE FOR SECTION 311 COULD IMPROVE U.S. ANTI-MONEY LAUNDERING EFFORTS 21 (2008), Joint Appendix ("JA") 236. A notice proposing to impose the fifth special measure often has effects overseas, as well, as illustrated by the fact that "several foreign governments have

strengthened their laws and regulations in response to proposed rules." *Id.* at 22, JA 237.

When FinCEN is able to achieve the objective of imposing the fifth special measure without completing rulemaking, the agency typically withdraws the notice of proposed rulemaking. *See, e.g.*, Withdrawal of the Proposed Rulemaking Against Lebanese Canadian Bank SAL, 80 Fed. Reg. 60,575 (Oct. 7, 2015).

**B.  *Procedural History***

Appellants Ramon and Higini Cierco were the majority shareholders in Banca Privada d'Andorra S.A., a private bank in the country of Andorra that held less than two billion euro in assets in 2015. *See Cierco v. Lew*, 190 F. Supp. 3d 16, 18 (D.D.C. 2016) (describing the ownership structure of the Bank); Notice of Finding That Banca Privada d'Andorra Is a Financial Institution of Primary Money Laundering Concern, 80 Fed. Reg. 13,464, 13,464 (Mar. 6, 2015) ("Notice of Finding") (reporting that the Bank held "1.79 billion euro in assets").

In March 2015, FinCEN issued its Notice of Finding alleging that the Bank had "facilitated financial transactions on behalf of Third-Party Money Launderers . . . providing services for individuals and organizations involved in organized crime, corruption, smuggling, and fraud." Notice of Finding, 80 Fed. Reg. at 13,464. FinCEN claimed that the Bank "fail[ed] to conduct adequate due diligence on customer accounts" and provided "high-risk services to shell companies" – features that made the Bank "highly attractive and well known to [Third-Party Money Launderers]." *Id.* at 13,465.

The same day that FinCEN published the Notice of Finding, it also published a Notice of Proposed Rulemaking to impose the fifth special measure. Imposition of Special Measure Against Banca Privada d'Andorra as a Financial Institution of Primary Money Laundering Concern ("NPRM"), 80 Fed. Reg. 13,304 (Mar. 13, 2015). The NPRM stated that the fifth special measure was necessary to address the primary money laundering concern and that it would not impose "an undue regulatory burden" because "only four U.S. covered financial institutions maintain an account for [the Bank]." *Id.* at 13,305.

One day after FinCEN announced that it was preparing to take action against the Bank, the Andorran Government declared that it would seize control of the Bank. *See* Press Release, Institut Nacional Andorrá de Finances (Mar. 11, 2015), JA 286. In April 2015, the Andorran Government appointed a new administrator for the Bank. *See* Press Release, Agency for the Restructuring of Financial Entities ("AREB"), AREB Assumes the Tutelage of BPA (Apr. 27, 2015), JA 288. Then, a few months later, the Andorran Government created a new bank ("Vall Banc"), to which it transferred the lawful assets of Banca Privada d'Andorra, in preparation to sell off those assets. *See* Press Release, AREB, The Board of the AREB Creates the New Bank Named Vall Banc (July 22, 2015), JA 290. The Andorran Government stated that Vall Banc would be a "bridge institution." Press Release, AREB, The AREB Will Create a "Good Bank" With Legitimate Assets and Liabilities Segregated From BPA (June 15, 2015), JA 294. This meant that, as it operated Vall Banc, the Government would "strict[ly] review" the assets of Banca Privada d'Andorra to determine which assets were lawful and which were tainted by money laundering. *See id.*

On October 7, 2015, after the Government of Andorra had transferred the Bank's assets to Vall Banc and while it was reviewing those assets in preparation for sale, Appellants filed suit in the District Court. They claimed that FinCEN's issuance of the Notices was arbitrary and capricious, in violation of the APA, because FinCEN did not consider relevant evidence, relied on inaccurate evidence, and imposed a disproportionate penalty. *See* Complaint at 35–38, *Cierco v. Lew*, No. 15-cv-1641 (D.D.C. Oct. 7, 2015), ECF No. 1, JA 45–48. Appellants also claimed that FinCEN violated their Due Process rights and exceeded the scope of its delegated authority. *See id.* at 38–42, JA 48–52. Finally, although Appellants' complaint sought a number of remedies, their two principal claims for relief were: (1) an order requiring FinCEN to withdraw the Notices, and (2) a declaration that the Notices were unlawfully issued. *Id.* at 43, JA 53. These two claims for relief frame the issues that are before the court on this appeal.

On January 25, 2016, FinCEN filed a motion to dismiss, claiming, *inter alia*, that Appellants lacked standing because the Andorran Government's seizure of the Bank's assets could not be redressed by the District Court. *See* Memorandum in Support of the Motion to Dismiss 9–12, *Cierco v. Lew*, No. 15-cv-1641 (D.D.C. Jan. 25, 2016), ECF No. 29-1.

On March 4, 2016, FinCEN announced that it was withdrawing both its Notice of Finding and Notice of Proposed Rulemaking, citing "[s]ignificant developments" ensuring that the Bank "is no longer operating as a financial institution that poses a money laundering threat to the U.S. financial system." Withdrawal of Notice of Proposed Rulemaking Regarding Banca Privada d'Andorra, 81 Fed. Reg. 11,496, 11,497 (Mar. 4, 2016) ("Notice of Withdrawal"); *see also* Withdrawal of Finding Regarding Banca Privada d'Andorra, 81 Fed. Reg. 11,648 (Mar. 4, 2016) (withdrawal of Notice of Finding).

Those developments included the Andorran Government's "control of [the Bank]," "the creation of the bridge bank," and the planned sale of that bank. Notice of Withdrawal, 81 Fed. Reg. at 11,497. FinCEN filed a notice of this withdrawal with the District Court on February 19, 2016, arguing that the case "should also be dismissed as moot." *Cierco*, 190 F. Supp. 3d at 21. The District Court ordered supplemental briefing on the question of mootness. *Id.* at 22.

While the parties were filing their supplemental briefs, the Andorran Government selected J.C. Flowers & Company, a United States-based investment firm, as the acquirer of Vall Banc. *See* Br. for Appellees at 14; *see also* Press Release, AREB, AREB Selects US Investment Firm J.C. Flowers & Co. as Buyer of Vall Banc (Apr. 21, 2016), http://areb.ad/images/areb/comunicats/21042016_AREB_EN G.pdf.

Then, on May 18, 2016, the District Court granted FinCEN's supplemental motion to dismiss. *Cierco*, 190 F. Supp. 3d 16. The District Court found that the case was moot, and that neither the doctrine of "voluntary cessation" nor the doctrine of "capable-of-repetition-yet-evading review" barred such a finding. *Id.* at 23–28. On July 14, 2016, after the issuance of the District Court's decision, the Andorran Government finalized the sale of Vall Banc to J.C. Flowers. Press Release, AREB, AREB Transfers Vall Banc to US Investment Firm J.C. Flowers & Co. (July 14, 2016), http://areb.ad/images/areb/comunicats/14072016_AREB_EN G.pdf). Appellants now appeal the District Court's decision.

## II. ANALYSIS

### A. *Standard of Review*

We review *de novo* the District Court's grant of FinCEN's motion to dismiss. *See Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 566 F.3d 219, 221 (D.C. Cir. 2009).

### B. *Summary of the Analysis*

We agree with the District Court's ultimate decision to dismiss this case. However, we do not agree that the disposition of Appellants' claims can rest solely on mootness.

The case is undoubtedly moot with respect to Appellants' first claim for relief – a request that FinCEN withdraw the Notices. At oral argument, Appellants' agreed that their request for relief on their first claim has been fully satisfied. Oral Arg. at 7:15-7:45, 14:00-14:15. Therefore, there is no live dispute left on this claim.

Appellants' second claim for relief – a request for a declaration that the Notices were unlawful – is not moot, however. Nonetheless, as we explain below, Appellants no longer have standing to pursue this claim.

### C. *Appellants' First Claim for Relief is Moot*

As noted above, Appellants have conceded that they received all of the relief that they requested on the first claim for relief in their complaint. FinCEN "rescind[ed] the [Notice of Finding] and set[] aside the [Notice of Proposed Rulemaking]." Complaint at 43, JA 53. These actions by FinCEN completely vitiated the Notices.

"Because the exercise of judicial power under Article III depends upon the existence of a case or controversy, a federal court may not render advisory opinions or decide questions that do not affect the rights of parties properly before it." EDWARDS, ELLIOTT, & LEVY, FEDERAL STANDARDS OF REVIEW 134 (2d ed. 2013) (citing *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam)). If a case is moot, the court must dismiss it for lack of jurisdiction.

> There are two principal exceptions to mootness. The first pertains to situations in which "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration," yet there is a "demonstrated probability that the same controversy will recur involving the same complaining party." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam).

> . . . .

> The second principal exception involves a party's "voluntary cessation" of the challenged activity. As a general rule, a defendant's "voluntary cessation of allegedly illegal conduct does not deprive [a court] of power to hear and determine the case." *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). Voluntary cessation will only moot a case if "there is no reasonable expectation . . . that the alleged violation will recur" and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* The defendant carries the burden of demonstrating "that there is no reasonable expectation that the wrong will be repeated," and "[t]he burden is a heavy one." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

*Id*. at 135. Neither exception applies here.

The capable of repetition, yet evading review exception to mootness applies only "where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis v. FEC*, 554 U.S. 724, 735 (2008) (citation and internal quotation marks omitted). Appellants make no claim that these conditions exist here.

The voluntary cessation exception also does not apply here. The Government has assured the court that the disputed Notices have been completely withdrawn. Br. for Appellees at 18, 28. Appellants do not contest this. Indeed, Appellants have never even suggested that there is any likelihood that FinCEN will reissue the withdrawn Notices. *See Cierco*, 190 F. Supp. 3d at 24 (recognizing "Plaintiffs' own failure to argue that the government will impose the fifth special measure on [the Bank] in the future"). Nor could they plausibly advance such a claim. After the Bank was seized by the Andorran Government and its assets were transferred to Vall Banc, FinCEN concluded that the Bank "is no longer operating as a financial institution that poses a money laundering threat to the U.S. financial system." Notice of Withdrawal, 81 Fed. Reg. at 11,497. Given these circumstances, and the subsequent finalization of the sale of Vall Banc to J.C. Flowers, Appellants cannot now show that they are likely to suffer the same injury in the future.

Therefore, on the record before us, it is quite clear that Appellants' first claim – that the Notices be withdrawn – is moot.

**D.** *The Framework for Analyzing Appellants' Standing*

As the Court explained in *Lujan v. Defenders of Wildlife*,

> the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

504 U.S. 555, 560–61 (1992) (citations, internal quotation marks, and brackets omitted).

"Standing can be raised at any point in a case proceeding and, as a jurisdictional matter, may be raised, *sua sponte,* by the court." *Steffan v. Perry*, 41 F.3d 677, 697 n.20 (D.C. Cir. 1994) (en banc). Indeed, we have a "special obligation to 'satisfy [ourselves] . . . of [our] own jurisdiction.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). Where a party's "Article III standing is unclear," we "*must* resolve the doubt, *sua sponte* if need be." *Lee's Summit v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000) (emphasis added).

"[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). As explained above, Appellants requested two principal forms of relief in their complaint. Their first claim – that the Notices be withdrawn – is moot. So the matter of standing with respect to this claim is of no moment. Appellants' second claim – their request for a declaration that the Notices were illegal – is not moot. Given these circumstances, we must consider whether Appellants still have standing to raise it. The Court's decision in *Lyons* establishes the framework for our analysis.

In *Lyons*, the plaintiff sought damages, an injunction, and declaratory relief after police officers injured him in a chokehold. 461 U.S. at 97–98. During the course of the litigation, the Los Angeles Police Department implemented a six-month moratorium on the use of chokeholds, and Los Angeles then suggested that the case may be moot. *Id.* at 100–01. The Court acknowledged that, although the plaintiff "still ha[d] a claim for damages against [Los Angeles] that appear[ed] to meet all Art. III requirements," he no longer had *standing* to pursue his request for injunctive relief because of the "speculative nature of his claim that he will again experience injury." *Id.* at 109. "[T]he issue here is not whether [the damages] claim has become moot but whether Lyons meets the preconditions for asserting an injunctive claim in a federal forum." *Id.*

*Lyons* points the way to understanding that when one of a plaintiff's requests for relief is no longer live – either because that relief is granted, the parties have settled, or the claim has otherwise become moot – a natural issue that arises is whether the plaintiff has standing to pursue related, remaining requests for relief. *Lyons* followed the approach taken by the Court in *DeFunis v. Odegaard*, 416 U.S. 312 (1974), and *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115 (1974), and the

principles that evolved have been followed by the courts ever since.

The Court's decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), is another good example. Plaintiffs in that case filed suit against the United States Forest Service for failing to apply notice-and-comment procedures when it approved the "Burnt Ridge Project." *Id.* at 491. Plaintiffs also challenged the underlying Forest Service regulations. *Id.* During the course of litigation, the parties "settled their dispute" regarding the Burnt Ridge Project specifically, but plaintiffs continued to press their challenge to the underlying regulations. *Id.* at 491–92. The Court, citing *Lyons*, found that plaintiffs lacked standing to bring their remaining requested relief:

> We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to his interests.

*Id.* at 494. After holding that plaintiffs' first request for relief was moot, the Court analyzed plaintiffs' standing to continue litigating their remaining request. As suggested in *Lyons*, the central framework was clear: when plaintiffs settled one of their requests for relief, the natural question became whether they had standing to press for the additional remedies that had been sought in the complaint.

Our own case law is perfectly consistent with this line of cases. *See, e.g.*, *Maydak v. United States*, 630 F.3d 166 (D.C. Cir. 2010) (holding that prisoners lacked standing to continue

challenging an Inmate Trust Fund after they were released from custody); *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86 (D.C. Cir. 1986) (holding that plaintiffs had standing to continue pressing their facial challenge to government guidelines even after being awarded a fee waiver in connection with their request under the Freedom of Information Act because they were frequent FOIA requesters who would be affected by the guidelines in the future and the challenge was ripe for judicial review).

As the Court made clear in *Summers*, when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but that portion of the action is rendered moot, the plaintiff does not retain standing to challenge the regulation that was the basis for that action apart from any concrete application that threatens imminent harm to his interests. 555 U.S. at 494. We must now determine whether Appellants still have standing to seek a declaration that the disputed Notices were unlawful even though the Notices have been withdrawn.

### E. *Appellants Lack Standing to Pursue Their Second Claim for Relief*

Appellants' second claim for relief seeks a "decision holding that the [Notices] were issued unlawfully." Br. of Appellants at 21. Even if we assume that Appellants have cognizable injuries and can show causation to support standing, they have not demonstrated that it is "likely, as opposed to merely speculative, that the[ir] injur[ies] will be redressed by a favorable decision" from this court. *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted).

In assessing Appellants' standing, although we "accept the[ir] well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in [their] favor,"

we do not "accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)). We hold that Appellants lack standing because the redress that they seek is far too speculative to support their invocation of federal court jurisdiction.

In their brief to this court, Appellants attempt to explain how a decision from this court holding that the two Notices were unlawful would redress their injuries:

> [T]here is a substantial likelihood that a decision finding that FinCEN improperly labeled [the Bank] as of "primary money laundering concern" would materially impact the position of Andorran authorities as to the proper course to be followed with respect to the sale of [the Bank's] assets, what should be done with the corporate structure and any assets that remain, and how the Ciercos, as [the Bank's] owners, should now be treated in the process.

Br. of Appellants at 30. This explanation suffers from both factual and legal infirmities.

First, with regard to the assets transferred to the bridge bank, the window of time to "impact the position of Andorran authorities" has closed. On July 14, 2016, after having transferred the Bank's assets to the Government-run bridge institution, the Andorran Government finalized the sale of the assets. Press Release, AREB, AREB Transfers Vall Banc to US Investment Firm J.C. Flowers & Co. (July 14, 2016), http://areb.ad/images/areb/comunicats/14072016_AREB_EN G.pdf). Appellants do not dispute the facts proffered by Appellees to show that the Bank's assets had been seized and

sold. *See* Br. for Appellees at 10–12. The record thus indicates that the Bank's assets have been out of the hands of the Andorran Government for nearly a year now, and Appellants fail to offer any path of events by which the Andorran Government could or would unwind the sale.

Second, Appellants may be correct that FinCEN's Notices "indisputably prompted Andorra's actions against [the Bank]." Br. of Appellants at 31. Even were that the case, however, it is far from clear that a declaration that FinCEN violated the APA in promulgating the Notices would cause Andorra to reverse course. Appellants offer only conjecture, but no evidence, suggesting that the Andorran Government would be influenced by such a declaration to undo the sale of Vall Banc to J.C. Flowers or to return any assets still held by the Government. Appellants are effectively asking this court to "accept inferences that are unsupported by the facts set out in the complaint." *Arpaio*, 797 F.3d at 19 (citation and internal quotation marks omitted). Appellants have offered no evidence that the Andorran Government would reverse course as a result of the withdrawal of FinCEN's Notices. And they have not shown that the sale actually could be undone even if the Andorran Government were so inclined.

Third, Appellants contend that, in rejecting their claim, the District Court erred in "consider[ing] facts beyond the pleadings." Br. for Appellants at 34. Appellants appear to be referring to the information about political developments in Andorra that took place after Appellants filed their complaint. In any event, their contention is misguided. We have made it clear that, "[i]n determining standing, we may consider materials outside of the complaint." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Indeed, Appellants apparently understand this because, during oral argument before this court, they asserted that the Andorran

Government still holds "1.5 billion euros" of the Bank's assets. Oral Arg. at 16:50-17:10. But the assertion was not supported by any evidence.

Finally, and most importantly, even as we view all of the relevant facts in the light most favorable to Appellants, we find that their arguments in support of redressability are much too speculative to support standing. We are particularly disinclined "to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013). It is well understood that standing is "substantially more difficult to establish" when it "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.)). In such cases, the plaintiff must offer "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007) (citation and internal quotation marks omitted). Appellants have offered no such evidence.

We have been particularly reluctant to find standing where the third party upon whose conduct redressability depends is a foreign sovereign. *See, e.g.*, *Dellums v. U.S. Nuclear Regulatory Comm'n*, 863 F.2d 968, 976 (D.C. Cir. 1988) (noting that "[o]ur own decisions . . . have declined to recognize standing when the effectiveness of the relief requested depends on the unforeseeable actions of a foreign nation"); *Cardenas v. Smith*, 733 F.2d 909, 914 (D.C. Cir. 1984) (holding that plaintiff lacked standing because "the relief

in the present case could be obtained only through the consent of the Swiss government").

As Appellants would have it, a judicial declaration that the Notices issued by FinCEN were unlawful would encourage the Andorran Government to unwind the seizure of the Bank's assets and the subsequent sale of those assets to J.C. Flowers and to return any assets still held by the Government. Their claim thus "depends on the unforeseeable actions" of the Andorran Government, which is not enough to support redressability. *Dellums*, 863 F.2d at 976. Appellants offer no evidence that the Andorran Government would respond as they suggest. "When redress depends on the cooperation of a third party, it becomes the burden of the [appellant] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24–25 (D.C. Cir. 2000) (citation and internal quotation marks omitted). Appellants have not met this burden.

### III.    CONCLUSION

For the reasons stated in this opinion, we affirm the judgment of the District Court dismissing Appellants' complaint. We have no jurisdiction to hear their claims.