# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 12, 2019        Decided July 7, 2020

No. 18-1022

JORDAN LOUIE, ET AL.,
PETITIONERS

v.

STEPHEN DICKSON, ADMINISTRATOR AND FEDERAL AVIATION
ADMINISTRATION,
RESPONDENTS

———

Consolidated with 18-1336

———

On Petitions for Review of Actions of
the Federal Aviation Administration

———

*Peter R. Steenland Jr.* argued the cause for petitioners. With him on the brief was *James R. Wedeking*.

*J. David Gunter II*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, and *Eric Grant*, Deputy Assistant Attorney General.

Before: SRINIVASAN, *Chief Judge,* and GRIFFITH and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  Petitioners, residents living near the Paulding Northwest Atlanta Airport, seek review of several Federal Aviation Administration actions related to a proposed airport expansion.  Petitioners contend that those actions violate the Administrative Procedure Act, the National Environmental Policy Act, and the Department of Transportation Act.  We dismiss the petitions for lack of jurisdiction because none of petitioners' challenges involves an ongoing case or controversy.

I.

A.

The Airport and Airway Improvement Act, 49 U.S.C. §§ 47101 *et seq.*, authorizes funding for airport development and improvement projects.  For a project to be eligible, the Secretary of Transportation must have received written assurances that the airport owner or operator "will maintain a current layout plan of the airport" with certain portions of the plan subject to the Secretary's approval. *Id.* § 47107(a)(16)(B). The Secretary has delegated that authority to the Federal Aviation Administration (FAA).  *See id.* § 106(g); *Village of Bensenville v. FAA*, 457 F.3d 52, 58 (D.C. Cir. 2006).  The FAA's approval, as relevant here, can implicate two statutes pertaining to environmental considerations:  (i) the National Environmental Policy Act (NEPA), and (ii) Section 4(f) of the Department of Transportation Act.

First, should approval constitute a "major Federal action[] significantly affecting the quality of the human environment," NEPA requires preparation of an environmental impact

statement. 42 U.S.C. § 4332(C). To decide whether an environmental impact statement is required, the FAA prepares an environmental assessment (EA). 40 C.F.R. § 1501.4(b). An EA "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement." *Id.* § 1508.9(a)(1). If an EA determines an environmental impact statement is not required, the FAA issues a finding of no significant impact (FONSI). *Id.* § 1501.4(e).

FAA guidance establishes time limits on the validity of FONSIs. In particular, "[i]f major steps toward implementation of the proposed action," such as construction, "have not commenced within three years from [a FONSI's issuance], a written re-evaluation must be prepared." FAA Order 1050.1F, ¶ 9-1.b, J.A. 616. A new or supplemental EA must be prepared unless the written re-evaluation indicates, as relevant here: (i) that the "proposed action conforms to plans [addressed in the FONSI] and there are no substantial changes in the action that are relevant to environmental concerns"; and (ii) that the "[d]ata and analyses contained in the previous EA and FONSI or EIS are still substantially valid and there are no significant new circumstances or information relevant to environmental concerns." *Id.* at ¶ 9-2.c, J.A. 617.

Second, the FAA's approval may also implicate Section 4(f) of the Department of Transportation Act, which applies to approvals of a "transportation program or project." 49 U.S.C. § 303(c). Under that provision, the FAA may not approve a project requiring "the use of publicly owned land of a . . . recreation area . . . of national, State, or local significance," unless "there is no prudent and feasible alternative to using that land" and the project includes "all possible planning to minimize harm" to the protected resource. *Id.*

The FAA may also delegate some of those responsibilities to States. Under the FAA's State block grant program, the FAA may designate up to twenty qualified States "to assume administrative responsibility for all airport grant amounts." *Id.* § 47128(a). To be eligible, a State must have "agreed to comply with United States Government standard requirements for administering the block grant, including [NEPA], State and local environmental policy acts, Executive orders, agency regulations and guidance, and other Federal environmental requirements." *Id.* § 47128(b)(4).

B.

In 2005, the FAA approved an EA and issued a FONSI on construction of the Paulding Northwest Atlanta Airport. The Paulding County Airport Authority, however, was unable to develop much of the originally planned area, leading the Authority to propose the expansion at issue. Because the Georgia Department of Transportation (GDOT) joined the FAA's State block grant program in 2008, the expansion required GDOT approval. In 2011, GDOT approved a supplemental EA for the expansion and issued a FONSI. The FAA also approved the supplemental EA, but noted that its approval only provided the findings necessary for future action and did not thereby authorize any funding.

Subsequently, the Airport Authority became interested in also developing commercial service from the Airport, which requires an Airport Operating Certificate. *See* 14 C.F.R. §§ 139.1(a), 139.101(a). Because GDOT lacks authority under the State block grant program to grant that certificate, the Airport Authority applied to the FAA. In April 2014, the FAA announced its proposed EA for the application. *See* Notice of Intent to Prepare an Environmental Assessment for the Proposed Part 139 Operating Certificate and Related Actions

at Paulding Northwest Atlanta Airport, 79 Fed. Reg. 22,177 (Apr. 21, 2014). According to the notice, the EA would consider the impacts of twenty listed proposed actions, including the expansion, and of actions unrelated to commercial service but expected around the same time. *Id.* at 22,177–78. In October 2015, the FAA issued a draft EA. *See* Notice of Availability for Draft Environmental Assessment for the Proposed Part 139 Operating Certificate and Related Actions and Notice for Public Hearing at Paulding Northwest Atlanta Airport, 80 Fed. Reg. 64,053 (Oct. 22, 2015).

During the FAA's work on that EA, the Airport Authority and GDOT separately studied the expansion. GDOT, as noted, had already done so in the 2011 supplemental EA, but since more than three years had passed, FAA guidance required a written re-evaluation. *See* FAA Order 1050.1F, ¶ 9-1, J.A. 617. In May 2017, the Airport Authority issued and GDOT approved a written re-evaluation, concluding that the 2011 supplemental EA remained valid and that no new supplemental EA was necessary. In September 2017, the FAA concurred in that written re-evaluation and withdrew the expansion from the scope of the then-pending EA. *See* Notice of Modification to Previously Published Notice of Intent to Prepare an Environmental Assessment, 82 Fed. Reg. 42,221, 42,221 (Sept. 6, 2017).

Petitioners, residents living in the vicinity of the Airport who had submitted comments on the draft EA concerning the expansion, requested reconsideration of the FAA's decision to concur in the written re-evaluation. Petitioners contended that FAA guidance required a new supplemental EA because the expansion did not conform to the plans studied in the 2011 supplemental EA, certain data underlying it was no longer valid, and significant new information relevant to environmental concerns had come to light.

In January 2018, the FAA denied reconsideration. The FAA first noted that petitioners' request "may have been more appropriately directed to [GDOT]," because "the State ha[d] been responsible for most of the administrative responsibilities, including applicable environmental review requirements," since joining the State block grant program in 2008. Letter from Michael S. Fineman, FAA, to Peter Steenland, Sidley Austin (Jan. 18, 2018), J.A. 128. The FAA explained that it had reviewed the written re-evaluation given its sensitivity, but "withdrawal of the FAA's concurrence would not require Georgia to withhold block grant funding." *Id.* At any rate, the FAA concluded that petitioners had not demonstrated that the written re-evaluation failed to satisfy agency guidance. In response, petitioners filed a petition for review, which is Case No. 18-1022 in our court.

In October 2018, while that case was pending, the FAA reversed course and decided to withdraw its concurrence in the written re-evaluation. In a letter to GDOT, the FAA reiterated its view that GDOT is "responsible for administering the Airport Improvement Program," including "environmental review." Letter from Elliott Black, Dir., Office of Airport Planning and Programming, FAA, to Russell McMurry, Commissioner, GDOT (Oct. 31, 2018), J.A. 131. The FAA explained that its concurrence had been "a mere gesture of support" and had "no legal effect." *Id.* Without commenting on the written re-evaluation's validity, the FAA decided to withdraw its concurrence to keep "lines of responsibility and accountability" clear. *Id.* Petitioners then filed another petition for review, which is Case No. 18-1336 in our court.

The two cases are now consolidated in our court, and together, they present challenges to four FAA actions: (i) the FAA's decision to withdraw the expansion from the

then-pending commercial service EA; (ii) the FAA's simultaneous concurrence in GDOT's written re-evaluation; (iii) the FAA's denial of reconsideration of that concurrence; and (iv) the FAA's subsequent decision to withdraw its concurrence. Contending that those actions violate the APA, NEPA, and Section 4(f), petitioners ask us to vacate all four actions and remand to the FAA for further environmental analysis.

## II.

We begin and end with the question of our jurisdiction. The relevant doctrines are standing, which generally turns on the circumstances at the commencement of the suit, and mootness, which generally turns on developments thereafter. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Each of those doctrines applies to each form of relief requested. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (standing); *J.D. v. Azar*, 925 F.3d 1291, 1307 (D.C. Cir. 2019) (mootness). We thus proceed claim by claim, and we ultimately conclude that one or the other of the two doctrines requires dismissing each of the claims before us.

## A.

We begin with petitioners' challenge to the FAA's decision to withdraw its concurrence in GDOT's written re-evaluation. Petitioners lack standing to pursue that claim.

To satisfy the "irreducible constitutional minimum" of standing, petitioners must have suffered an "injury in fact" that is both "fairly traceable to the challenged action" and likely to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation omitted). "The

party invoking federal jurisdiction bears the burden of establishing [those] elements." *Id.* at 561.

Petitioners allege injuries that would flow from construction of the airport expansion. For instance, petitioners Robert and Mary Board allege that they live on a section of Bluffy Creek that is home to threatened Cherokee darters, which they spend time observing. Petitioner Anthony Avery lives near and engages in hunting and other recreational activities in the Paulding Forest Wildlife Management Area, through which Bluffy Creek flows. Petitioners aver that construction of the expansion will increase erosion, sedimentation, and turbidity in Bluffy Creek. They allege that the expansion will harm their recreational and aesthetic interests, through disruption of Cherokee darter habitat, filling of wetlands, and clearing of trees.

Those injuries, while cognizable, are not fairly traceable to the challenged action: the FAA's withdrawal of its concurrence in the written re-evaluation. Petitioners contend that the FAA's withdrawal of its concurrence authorizes the expansion. It does not. Instead, it removes the FAA's endorsement of GDOT's environmental analysis, concluding that responsibility for that analysis lies solely with GDOT. Any injury attendant to construction of the expansion thus flows from GDOT's approval and the Airport Authority's decision to proceed, not from the FAA's withdrawal of its approval.

That analysis, in petitioners' view, improperly wades into the merits of their claim. To be sure, "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the [petitioners], and must therefore assume that on the merits the [petitioners] would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235

(D.C. Cir. 2003) (per curiam). Petitioners argue that we therefore must assume there is "[f]ederal action" sufficient to trigger NEPA, 42 U.S.C. § 4332(C), and a "transportation program or project" triggering Section 4(f), 49 U.S.C. § 303(c).

Doing so, however, only underscores the lack of a causal relationship between the claimed injuries and the challenged action. Assuming without deciding that the expansion is federal in character and requires the FAA's approval, the FAA's withdrawal of its concurrence makes clear that the agency has not given that approval. If anything, the FAA's withdrawal makes the expansion, and in turn petitioners' injuries, *less* likely under petitioners' view of the merits. Tellingly, petitioners themselves sought that withdrawal in their request for reconsideration of the FAA's concurrence, and indeed still seek it here.

Perhaps petitioners could challenge some other FAA action approving or funding the expansion. But the FAA's withdrawal of its concurrence does the opposite: that action revokes the agency's ostensible approval. Because petitioners' injuries are not fairly traceable to that action, petitioners lack standing to challenge it.

B.

Petitioners' remaining challenges concern the FAA's concurrence in GDOT's written re-evaluation, the FAA's denial of reconsideration of that concurrence, and the FAA's withdrawal of the airport expansion from the then-pending commercial service EA. Those challenges are all moot.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Cty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979)

(citation omitted). Mootness prevents federal courts from deciding controversies when "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990). Thus, "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever," the appeal is moot. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted).

During the pendency of petitioners' challenges to the FAA's concurrence in the written re-evaluation and denial of reconsideration, the FAA withdrew its concurrence, mooting those challenges. A challenge seeking an agency's withdrawal of a notice becomes moot when the agency withdraws the notice. *See Cierco v. Mnuchin*, 857 F.3d 407, 415 (D.C. Cir. 2017). Here, petitioners acknowledge that a remand to the FAA to withhold its concurrence would relieve any injuries stemming from it. That is exactly what the FAA has already done administratively through its withdrawal. Because we cannot grant any relief beyond that already afforded, petitioners' challenges are moot.

Petitioners contend that, because they also challenge the FAA's withdrawal of its concurrence, their challenges to the concurrence and denial of reconsideration are not moot. Petitioners suggest that we can vacate the mooting circumstance, restoring the FAA's concurrence. We cannot. Petitioners lack standing to request vacatur of the withdrawal.

Similarly, while petitioners' challenge to the FAA's decision to consider the expansion separately from the commercial service EA was pending, the FAA notified the Airport Authority that it had closed its file on the EA due to

insufficient progress and deemed the Authority's application for an Airport Operating Certificate withdrawn. Accordingly, the FAA no longer needs nor intends to prepare a commercial service EA, as no application for an Operating Certificate remains pending. It follows that the issues presented by petitioners' challenge to the FAA's decision to consider the expansion separately from the commercial service EA are no longer live.

Petitioners' challenge relies on the rule against segmentation, which prevents "an agency [from] avoid[ing] the NEPA requirement that an [environmental impact statement] be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental effects." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987) (per curiam). But no alleged avoidance persists when, as here, there is no longer any interrelated action contemplated. Nor have petitioners provided any reason to believe that any new application for an Airport Operating Certificate is impending. As a result, whether the airport expansion and introduction of commercial service are too interrelated to be considered separately is a hypothetical issue. Any opinion addressing it would "neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Transwestern Pipeline*, 897 F.2d at 575. Petitioners' challenge thus has become moot.

*     *     *     *     *

For the foregoing reasons, we dismiss the petitions for lack of jurisdiction.

*So ordered.*